AMERICAN CASTING MACH. CO. v. PITTSBURGH COAL WASHER CO.

(Circuit Court of Appeals, Third Circuit. November 13, 1916.)

No. 2119.

1. Patents ⬤⟶328—Validity—Apparatus for Casting Metal.

　　The Scott patent, No. 788,334, for an apparatus for casting metal, *held* void on the ground that the patentee had caused the invention to be patented in a foreign country more than seven months prior to his application for the United States patent.

2. Patents ⬤⟶97—Right to Patent—Prior Patenting in Foreign Country—"Caused to be Patented."

　　While an application for a patent in the name of three persons as joint inventors was pending, one of such persons, representing also the other

⬤⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

two, caused the invention to be patented in Great Britain. Afterward the joint application in this country was abandoned, and more than seven months after the British application was filed one of the joint applicants filed an application for a patent for the same invention in his name as sole inventor. *Held*, that the foreign patent was caused to be issued by such sole applicant, within the meaning of Rev. St. § 4887, as amended by Act March 3, 1897, c. 391, § 3, 29 Stat. 692 (Comp. St. 1913, § 9431, note), which was then in force and was a bar to the granting of a United States patent on such application.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 130, 131; Dec. Dig. ☜97.]

3. PATENTS ☜328—INVENTION—LINKS FOR CONVEYORS.

The McKennan & Helander patent, No. 806,700, for links for conveyors, *held* void for lack of invention.

Appeal from the District Court of the United States for the Western District of Pennsylvania; Charles P. Orr, Judge.

Suit in equity by the American Casting Machine Company against the Pittsburgh Coal Washer Company. Decree for defendant, and complainant appeals. Affirmed.

The following is the opinion of Orr, District Judge:

This patent suit originally involved three patents. Plaintiffs, prior to the trial, gave notice to the defendant that they would withdraw from consideration United States patent No. 629,480, issued July 25, 1899, to E. A. Uehling and James W. Miller, for "casting and conveying apparatus." No objection was made by the defendant to the withdrawal of such a patent. While no amendment of the bill was made, the bill must be deemed to have been amended in accordance with the notice. It is also deemed to have been amended by striking out the name of the plaintiff Fannie S. Miller as administratrix. These amendments upon the eve of trial have scarcely tended to clarify the issues between the parties, because the pleadings are weighted by irrelevant averments. Moreover, the affidavits of the experts now contain many immaterial matters.

The suit as it now stands involves United States patent No. 788,334, issued April 25, 1905, to James Scott, for "apparatus for casting metal" and United States patent No. 806,700, issued December 5, 1905, to J. B. McKennan and A. H. Helander, for "links for conveyors." Both of said patents are owned by the plaintiffs.

The answer denies conjoint or other use by the defendant, denies notice by the plaintiffs to the public, and denies that the patentees either solely or jointly were the original inventors of the apparatus shown in the respective patents. It admits notice to the defendant by the plaintiffs of the latter's claim of title. It sets forth in detail as prior disclosures 43 United States patents, 7 British patents, and 1 German patent. By stipulation dated a month or more before the trial, but filed thereafter, it was agreed that the answer might be amended by the addition of five more prior patents and by adding averments that the Scott patent, No. 788,334, is void because the application therefor was not filed within seven months of the filing of the application for British patent No. 3,880 of 1898, dated February 16, 1898, granted to James W. Miller, partly as communication through Edward A. Uehling and James Scott; that said Scott patent in suit, if valid when issued, expired with the limitation of said British patent, to wit, February 16, 1912; and that the acts charged in the bill occurred after said date, and after the alleged invention of the said patent in suit had become public property. By the stipulation it was further agreed that the application for British patent No. 3,880 of 1898 was filed February 16, 1898, and was accepted May 20, 1898, and that the patent, in pursuance thereof, was sealed on August 2, 1898. It was further stipulated that said E. A. Uehling, James W. Miller, and James Scott, named in the several United States and British patents involved in this case, are

the persons named in the patents here in suit, and further that the subject-matter of claims 2 and 5 of the Scott patent in suit is disclosed in the application for United States letters patent of said Uehling, Miller, and Scott filed December 7, 1897, Serial No. 626,022, which application never matured into a patent. The answer was never amended, but is deemed to have been, because the trial proceeded as if such amendment had been made.

The departures by the solicitors of both parties from the rule that the allegata and probata should agree in material matters has created a condition which may confuse a court in which the case was not originally brought. For that reason especially this court calls attention to them, and as well also that the members of the bar may be reminded of the rule mentioned. The stipulation contains a provision that proof of the facts referred to therein is waived. The stipulation was offered at the trial, but the facts were not, except inferentially, through the medium of the writing in which they are contained. The stipulation, and not the official notes of the stenographer, must be examined to find them.

Now, giving attention to the two patents in suit, it is to be first observed that they are by no means pioneer patents. They relate to improvements in apparatus for casting and conveying metals. But the apparatus described therein (for the improvements are capable of conjoint use) is chiefly used in the casting and handling of pig iron.

It is sufficient to refer to an expired United States patent of the above-named E. A. Uehling, No. 548,146, under date of October 15, 1895, where the disadvantages of casting pigs in the open sand molds upon the floor in front of the blast furnace is pointed out, and where the advantages of pouring the molten metal into molds of a uniform size, which are presented by mechanical operation, immediately under the metal as it flows from the furnace or ladle, and which carry the pigs formed therein to a proper dumping end, where they are automatically delivered into a suitable conveyance, are set forth. That patent of Uehling seems to be so broad in its scope that the subsequent patents referred to in this record, and relating to the same subject-matter, must be limited to the actual construction shown therein, if any invention be found.

The application for the Scott patent, No. 788,334, was filed August 31, 1899. More than seven months prior to that time, the application for the British patent, No. 3,880 of 1898, was filed. As appears from a copy of said English patent, James Willard Miller, as the applicant, states that the specifications are "partly as communication from Edward A. Uehling * * * and James Scott of Pittsburgh, * * * U. S. A." by section 3 of the act of Congress of 1897 (29 Statutes at Large, p. 692, c. 391) section 4887 of the Revised Statutes was amended so as to read as follows:

"Sec. 4887. No person otherwise entitled thereto shall be debarred from receiving a patent from his invention or discovery, nor shall any patent be declared invalid, by reason of its having been first patented or caused to be patented by the inventor or his legal representatives or assigns in a foreign country, unless the application for said foreign patent was filed more than seven months prior to the filing of the application in this country, in which case no patent shall be granted in this country."

By section 8 of the said act it is provided that such section of the Revised Statutes as amended should not apply to any patent granted prior to January 1, 1898, nor to any application filed prior to said date, nor to any patent granted on such application. If, therefore, James Scott had made an invention in accordance with the application for the patent in suit, and had the same first patented or caused to be patented by himself or his legal representatives or assigns more than seven months prior to the date of such application, he had no right to receive the patent in suit for such invention. It is necessary, therefore, to determine whether James Scott authorized the application for the British patent. If he did, then the patent procured upon the application of Mr. Miller can fairly be considered to have been Mr. Scott's act within the meaning of the said act of Congress.

The subject-matter of the Scott patent in suit was disclosed in the English patent. Without giving much weight to the fact that Mr. Scott is named in the English patent, we must conclude from the evidence that Mr. Scott authorized and approved the application therefor. There is in evidence a certified

copy of an application made by said Uehling, Miller, and Scott to the United States for a patent for "apparatus for casting metal." That application was filed December 7, 1897, and is No. 661,022. The 17 drawings which accompanied that application appear to be, in all respects, like the 17 drawings which became part of said British patent. On the 10th of November 1897, said Scott, as well as each of the others, made an affidavit in support of that application that the three named were joint inventors. That the application for the United States patent never ripened into a patent and seems to have been abandoned is perhaps immaterial here.

Mr. Scott, who at that time was in the employ of the Carnegie Steel Company, testified in this case upon cross-examination as follows: "Q. I understand from you that Mr. Uehling established an office in Pittsburgh, and had a draftsman, and made drawings in connection with these castings machines. Is that correct? A. Yes. Q. Who was the draftsman? A. If you will kindly ask Mr. White, he will give you the draftsman's name—Prochasky, I think. Q. Mr. Miller worked with Mr. Uehling? A. Oh, yes, yes. He was supposed to be the salesman. He was the fellow that went to Europe and tried to introduce it in Europe." Again: "Q. Will you please state what the circumstances were which led you to make that joint application with these three men? A. On account of the company saying they were to have access to all the improvements we were making on the machine, naturally; but I can't remember of going directly and swearing and giving them that, I can't remember. Q. Then you can't remember as to whether or not you did make the application for patents with them? A. I don't remember that. Q. Do you remember who was the attorney that drew up that application? A. I do not know, sir; I do not know. Q. Do you know why the application for patent was never granted? A. I really don't know anything about it. It never gave me any concern. My concern was to make the thing good, and to get it up the best that could be. The patent was a secondary consideration." Again: "Q. Well, now, did you ever talk with Mr. Uehling and Mr. Miller about Mr. Miller going to Europe to introduce the invention? A. I suppose that just came up. We would have to do something about it, naturally. I suppose they may have had a talk with me about going to Europe. I knew Miller did go to Europe to introduce the patents, but I don't remember that he was going to take out any patents. I am not sure about that. I don't know whether he did or not. I never spoke to Miller but once afterwards, after he came back from Europe. Q. I am speaking about before he went to Europe. You and Miller and Uehling had talked together about his going to Europe, and about the introducing of the invention over there in Europe, had you? A. I may have. I wouldn't deny that, but I can't remember. We were friendly enough while the thing was being put through, and no doubt exchanged ideas."

It is a proper inference from all that testimony that Mr. Scott knew and approved of the introduction of the subject-matter of the patent in countries outside of the United States, of course including England. It must be inferred that he authorized the protection of such rights as he might have in the invention in the best way, and it must be inferred that he knew that the best way to protect his rights in England was to procure a patent for the invention. The failure to procure Uehling and Miller as witnesses and to account for their absence is confirmatory of the conclusion reached.

It is impossible to conceive that the acts of Congress relating to patents would permit a joint inventor, who was a party to the procurement of a foreign patent, to obtain a patent for the same invention upon his sole application filed more than seven months after the application for the foreign patent. It is clear by the words of the statute that those who had applied for a patent in England, for a joint invention, could not, under the act, have procured a patent from the United States by an application for the same joint invention, filed more than seven months afterwards.

It is expressly disclaimed by the solicitors for the plaintiffs that the Scott patent in suit was a division of the United States application filed by Scott and his associates. This seems to be eminently proper, because it is hard to conceive it a division of the joint invention. Scott's early affidavit that it was a joint invention should have more weight than his testimony after the lapse of years to the effect that he was the sole inventor. The conclusion

therefore reached is that the Scott patent in suit was granted to him con-trary to law and is therefore invalid.

A consideration of the claims of the Scott patent leads to the conclusion that they are met in the prior art, except perhaps with respect to two elements in claim 2 and one element in claim 5, which claims are the only claims of that patent in litigation. These claims are as follows:

Claim 2: "In casting apparatus, the combination with one or more sets of molds, of mechanism for moving them, and a casting pot arranged to receive molten metal, said pot having a well and one or more integral lateral troughs, substantially as described."

Claim 5: "In casting apparatus, a mold having at its sides upwardly projecting splashers, substantially as described."

Taking up claim 2 first, we find in United States patent to Uehling, No. 548,146, and in United States patent to Uehling and Miller, No. 629,480, each for casting and conveying apparatus, a combination of the elements in claim 2 of the Scott patent in suit, except the well with which the intermediate casting pot is provided and the troughs integral leading from it. We find in the prior patents the troughs leading from the casting pot. We are not satisfied, however, that there is anything of invention in making parts integral with each other which before were separate. We find in those prior patents an intermediate casting pot, and if there should be a depression in the bottom of such casting pot there would be the well called for in the patent in suit. The intermediate casting pot of the Scott patent in suit is not a deep pot, because it is not intended to retain much of the molten fluid, but enough thereof to permit an even flow through the troughs to the molds. The pot and the troughs leading therefrom are lined with fire brick, but the fire brick in the bottom of the casting pot is so placed as to form a depression, which is called the well. This well is nothing more or less than an arrangement to protect the workmen from the splashing which would result from pouring the metal upon a flat surface. Mr. Scott, in his testimony, said that the pouring of molten metal was just like the pouring of water, and that if you let water run on the bottom of a bucket it will splatter all over it, but if there be water in the bucket it does not splatter so much. This well is but a depression of a few inches, and of course some of the molten metal remains therein and has to be removed therefrom by workmen. Mr. Scott stated that he has known men, in carelessness, rather than take the metal out of the well which had accumulated by the use of the apparatus to "put sand at each side of it, which the sand gave them the same thing—or a brick—because it would fall over either side, gave them the pool of iron." It is clear, therefore, that there could be no invention in having the well for the purpose for which it was intended, especially when the apparatus can be used without cleaning it out, and when the men prevent the splashing by raising an additional protection. This is not an instance of where difficulty had presented itself to the inventor and was not overcome until after experiment, but is rather the adoption of a practice apparent to any one desiring the result. There is nothing of invention in claim 2 of the Scott patent in suit. The same may be said of claim 5. The molds have at their sides what are called upward projecting splashers. The upward projecting splashers are merely extensions of the sides in order to retain the proper amount of molten metal in the molds and prevent it splashing out upon the machinery.

In the patent to Uehling, No. 548,146, and in the patent to Uehling and Miller, No. 629,480, the molds which are carried by the conveyor from the points where they are filled to the dumping end, and returned empty to be filled again, have an overlapping which prevents the molten metal from falling between the molds upon the links of the carriers. In the earlier patent the metal was poured transversely of the molds, and there was therefore no uneven flow of the metal toward the sides of the mold. In the later patent it was contemplated that the molten metal should be poured longitudinally of the molds. This necessarily made an uneven flow of metal as between the two sides of the mold. The side of the mold opposite the point of flow would resist a greater current than the opposite side, and yet the repulsion of that current towards the opposite side would tend to drive the liquid against it with a greater force than would be found if the arrangement of the Uehling

patent had been followed. It is such a self-evident proposition that to prevent an overflow by a current of liquid you must raise the height of the obstruction against which it flows that no invention can be found therein. This is specially true where the difficulty overcome has not been of long duration, and therefore has not been the subject of consideration by many men. From Mr. Scott's own testimony it seems that the matter of procuring a patent was a secondary consideration, to say the least. It is therefore reasonable to assume that he did not believe that he had invented anything valuable, else he would have been anxious to have the protection which the law affords. The conclusion is therefore reached that, apart from the effect of the statute hereinbefore referred to, claims 2 and 5 of the Scott patent in suit are void for lack of invention.

Taking up the other patent, we find in the patent to McKennan and Helander, No. 806,700, that the claims in issue read as follows:

"8. In a pig-casting machine, the combination of a series of molds, chains supporting said molds, each chain including a series of links having side members and a member rigidly connecting said side members, pins connecting successive links, and guide wheels on said pins between the side members of said links, each of the molds having its ends supported by the connecting members of a pair of links, substantially as described.

"9. In a pig-casting machine, the combination of a series of molds, chains for supporting said molds, each chain including a series of links, having side members, and a member rigidly connecting said side members, pins, connecting successive links, and guide wheels on said pins between the side members of said links, each of the molds having its ends supported by the connecting members of a pair of links, the connection between each mold and the links being arranged so that the weight of said mold is distributed equally between the two side members of the link, substantially as described.

"10. The combination in a pig-casting machine of a series of molds and chains for conveying the same, said chains including links each having two side members and a member rigidly connecting said side members, with a plate for each end of each mold, said plate being connected to the mold and to the connecting member of the link so that the weight of the mold is distributed equally between the side members of the link, substantially as described.

"11. The combination in a pig-casting machine of chains each having a series of links, pins connecting the links, and a series of pig molds having means for connecting them to the links so that their weight is distributed equally upon the two ends of each pin, substantially as described.

"12. The combination in a pig-casting machine of a series of molds each having projecting lugs at its ends, chains for the molds each including a series of links having two side plates and a substantially horizontal plate connecting the same, a wheel between the side plates of the adjacent ends of successive links, and pins connecting successive links and extending through their respective wheels, with a connecting piece fixed to the horizontal portion of each link and attached to the projecting lug at the end of the mold, substantially as described."

From the foregoing claims it would appear that the patent was perhaps limited in scope to the art of casting and conveying pigs. The patent, however, is not so limited, as appears from the specifications and the other claims which are not in suit. It relates to the art of conveying materials, regardless of their character. While relating to conveyors generally, it specially relates to the form of links in the chains to which the buckets or molds or other receptacles for the material to be conveyed are attached. In order that the material may be carried, the chain must be connected with wheels or rollers so placed that the axis of each wheel or roller is located at the point of connection between the successive links of the chain. If the periphery of the wheels or rollers be enlarged sufficiently, the receptacles for the material to be carried may be returned by a comparatively endless process, notwithstanding the nature of the receptacles, for there will be sufficient clearance for them upon the return track if the diameter of the wheels or rollers be made sufficiently great. Such receptacles are necessarily attached to the links between the wheels or rollers.

That the foregoing is illustrative of the functions and operations of links for conveyors for years prior to the application of the McKennan and Helander patent is apparent from the evidence in this case. It is urged, however, by the plaintiffs, that the patent now under consideration is the first appearance in the art of rigid connection with the side members of the links, and indeed of means for equally distributing the weight upon the pins upon which the guide wheels turn. The evidence in this case has failed to satisfy us that such contention on the part of the plaintiffs should be sustained. The patent, if valid at all, cannot be so broad as contended. Numerous examples of the prior art show such rigidity of connection and such equal distribution of load. It is unnecessary to refer to any but the Taplin patent, No. 413,635, of October 22, 1889. It is true the Taplin patent does not show the enlarged wheels by which clearance is given to the molds while they are being moved. It certainly is not invention to make the wheels as large as may be necessary to give clearance to that which the wheels may carry.

It is urged that invention should be found because there is shown to be economy in the operations of the apparatus of the patents in suit. Economy of operation is the effort of every successful manufacturer, and is the aim which induces the great majority of variations in mechanical operations and shop practices. The tendency to secure to one man a monopoly of an improvement which may reduce the wear and tear upon machinery should not be encouraged, where such improvement is one which any one skilled in the same art would have adopted to reach the same end.

The claims in suit of the McKennan and Helander patent are met in the prior art, and are void for want of invention.

The bill should be dismissed at plaintiffs' cost. Let a decree be drawn.

Clarence P. Byrnes and G. H. Parmelee, all of Pittsburgh, Pa., for appellant.

James I. Kay, A. Leo Weil, and Charles M. Clarke, all of Pittsburgh, Pa., for appellee.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

BUFFINGTON, Circuit Judge. In the court below the American Casting Machine Company, the owner of patent No. 788,334, granted April 25, 1903, to James Scott for "apparatus for casting metal," and of patent No. 806,700, granted December 5, 1905, to J. B. McKennan and A. H. Helander for "links for conveyors," filed a bill against the Pittsburgh Coal Washer Company, charging infringement of certain claims of said patents. On final hearing that court dismissed the bill, holding both patents lacked invention, and that the Scott patent was also invalid because, more than seven months before Scott applied for it, he had caused the same device to be patented in England. On entry of a decree dismissing the bill, the complainant appealed to this court.

[1] In the view we take of the Scott patent, it will not be necessary for us to decide whether the court below was right in holding it did not involve invention, for, apart from that question, we are of opinion that court rightly held the English patent avoided the Scott patent.

[2] By section 3 of the act of Congress of 1897 (29 Statutes at Large, p. 692), and by the act of March 3, 1903 (32 Statutes at Large, p. 1227), section 4887 of the Revised Statutes was amended to read as follows:

"No person otherwise entitled thereto shall be debarred from receiving a patent for his invention or discovery, nor shall any patent be declared invalid, by reason of its having been first patented or caused to be patented by the inventor or his legal representatives or assigns in a foreign country, unless the application for said foreign patent was filed more than seven months prior to the filing of the application in this country, in which case no patent shall be granted in this country."

Now, the patent here in suit, No. 788,334, for an apparatus for casting metal, was applied for by James Scott August 31, 1899, and granted April 25, 1905. More than seven months prior to Scott's application, to wit, on February 16, 1898, application was made for English patent No. 3,880, which patent was granted to James Willard Miller, who in his specification described himself as a manufacturer's agent, and therein stated that the said improvement was "partly a communication from Edward A. Uehling, a metallurgical chemist and engineer, of Newark, Essex, New Jersey, U. S. A., and James Scott, of Pittsburgh, Allegheny county, Pennsylvania, United States of America." Without entering into details, it suffices to say that the subject-matter of the Scott American patent is embodied in the Miller English patent, and, as the American patent was not applied for until more than seven months thereafter, the statute above recited forbade the grant of such patent, if Scott's invention or discovery had been "patented or caused to be patented by the inventor or his legal representatives or assigns" in England. After hearing the proofs the court below held that Scott had caused his invention to be patented in England more than seven months before he had applied for his American patent, and that under the statute quoted above the latter patent was void. In view of all the proofs, the relations of the parties concerned, and the inferences fairly deducible therefrom, we are of opinion the court below committed no error in decreeing Scott's patent void on that ground.

From the proofs it appears that this case concerns the change in pig metal casting from the old sand bed method in universal use to the modern casting in conveyor metal molds. The old process and the underlying features of the new method are contrasted in patent No. 548,146, applied for November 28, 1892, and granted October 15, 1895, to Edward A. Uehling, of Birmingham, Ala., for an apparatus for and method of casting and conveying metals. In such patent it is said:

"In the casting and handling of pig iron as now generally practiced the iron is run into open sand molds called 'pigs.' In this operation the iron runs direct from the furnace into a long sand runner, from which side runners are led off, called 'sows,' which feed the 'pigs.' The sows are cut off from the main runner as the 'pig beds' fill up, but the pigs must be detached from the sows and the latter broken into proper lengths for handling after the iron has set. This breaking off is done either while the iron is still red hot in the beds, making it an exceedingly hard task, or the iron is left to cool, in which case heavy bars and sledge hammers are required to break the pigs off the sows and then break the latter into proper lengths. After this breaking, water is sprayed over the iron, and when it has sufficiently cooled is gathered, loaded on trams, and taken to the yard, where it is piled. The scrap is then gathered from the beds, and the sand is wet down and molded up for another cast. These operations must be repeated from four to six times a day to take care of the product of a modern blast furnace, and they depend

almost entirely upon the brute force and physical endurance of the operators. The product is rough and irregular, and the operation is very wasteful, producing large quantities of scrap, which must be remelted, and carries much sand with the iron, which reduces the value of the iron. Moreover, this method of running the iron from the furnace into the sand is under very poor control. It sometimes runs so slowly that the iron chills in the long runner before it reaches the lower pig beds. At other times the running of the iron is with such a rush that the cores, which form the partitions between the pig molds, are washed away and the beds sheeted. In either case the iron must be taken up from the sand beds and remelted to make it marketable, besides the expense of having to break it up and remove it from the beds. The method above stated has also the disadvantage that the iron, as it runs from the furnace, is frequently of varying quality, and it is of common occurrence that several grades of iron are run from the furnace at the same cast. In this it not infrequently happens that a portion of the pig is deficient in those elements which are necessary to constitute good cast iron—as, for example, silicon and graphite carbon—while another portion has an excess of these elements. In either the iron has less value that it would have if the elements were properly mixed. In addition to all this, much difficulty is often experienced in keeping the slag from running with and contaminating the iron, as well as preventing some of the iron from being wasted with the slag. To avoid the disadvantages and difficulties above stated, and to reduce the cost of the production and improve the quality of the product, is the object of my invention, and which embraces a novel construction of plant, in which the metal is run from the furnace into a large reservoir, so mounted that it can be brought in communication with a series of movable molds, and its contents can be poured into the latter in a continuous and perfectly controlled stream, forming pigs of uniform size, which solidify on their way to the dumping end, where they are automatically delivered into a car or other suitable conveyance."

From the testimony of Scott, who was superintendent of the Isabella furnaces of the Carnegie Steel Company, it appears that he began in 1895 experimenting on the same general lines, but without knowledge of Uehling's work. Before, however, he had evolved any method or practical device, Scott's attention was called to Uehling's patent, then just issued. His account of the matter is, viz.:

"I remember, before we were about to start the machine, I said to H. N. Curry, who has since deceased, 'We ought to get Bakewell & Byrnes to furnish us with all the drawings or all the inventions that have ever been used for the handling of molten metal.' H. N. Curry was sitting across the table from me. He was looking at the Patent Office Gazette, and I had looked at it, looked it over, and here was the Uehling machine showing the conveyor, a man sitting under it, with a hose, and a ladle at the other end. I said to Curry, 'Lord, look at that. You better make some arrangements about seeing Uehling.' And they did; they made arrangements with Uehling; and Uehling came up here and opened an office, and had a draftsman, and had Miller, 'Shoebox' Miller, that is who he had with him, and after Uehling was given the half of the machine and the Carnegie Steel Company the other half, I was there to work it out for the money my company had put in and for my own reputation."

The half of the Uehling patent having been acquired by the complainant, a subsidiary company of Scott's employer, and the other half being held by Uehling and one Miller, it appears Scott was directed to improve on what Uehling had done, and to give Uehling and Miller full access to all he was doing in endeavoring to so improve. As we understand the proofs, Scott was to have no part in any patented improvements thus made in the line of his employment. In that regard, his testimony is:

"I was thus to work it out for the money my company had put in and for my own reputation. The patents gave me no consideration. I was told that Uehling and Miller had access to anything that I did. There is the whole thing."

As a result of further experimentation, certain departures were made from Uehling's device and were embodied in the commercial machine made and sold in large quantities by the complainant. Briefly stated, these changes consisted in three things: First, a well or dam was provided, which received the stream of metal poured from the assembling vessel into the device, a change which stopped the dangerous splashing incident to Uehling's device; second, the molten metal was made to run into the molds longitudinally, instead of transversely, and barriers were placed at the far end of the mold, changes which prevented overflow and clogging of the conveyor mechanism. These changes are embodied in the claims here in issue, and the question whether they involved invention over Uehling we do not, as we said above, here discuss or describe. These changes were embodied in an American patent application made jointly by Uehling, Scott, and Miller in Serial No. 661,002, filed December 7, 1897. In this application Scott united with Uehling and Miller in alleging "that they verily believe themselves to be the original, first, and joint inventors of the improvement in apparatus for casting metal described and claimed in the foregoing specification," and that "our invention is in the nature of an improvement upon the apparatus for casting metal described and claimed in letters patent No. 548,146, granted to Edward A. Uehling on October 15, 1895." This joint application for a joint invention was prosecuted for nearly three years, and this by the same firm of attorneys who were originally named by the three applicants as their attorneys, without any repudiation of their action by Scott. The last entry in this application is dated November 6, 1900, and is:

"Amendment filed October 20, 1900, has been entered. This puts the case for allowance, but it is withheld from issue on account of probable interference of another pending application."

While this joint application of the three patentees was pending, to wit, on February 16, 1898, Miller, one of the applicants, was sent to England to exploit the conveyor there. He is now dead, and Uehling was not called as a witness, so the only witness as to Miller's errand, and his authority, and the joint action and interest of the three, is Scott, who says:

"Q. I understand from you that Mr. Uehling established an office in Pittsburgh and had a draftsman and made drawings in connection with these casting machines. Is that correct? A. Yes. * * * Q. Mr. Miller worked with Mr. Uehling? A. Oh, yes. He was supposed to be the salesman. He was the fellow that went to Europe and tried to introduce it in Europe. * * * Q. Well, now, did you ever talk with Mr. Uehling and Mr. Miller about Mr. Miller going to Europe to introduce the invention? A. I suppose it just naturally came up. We would have to do something about it, naturally. I suppose they may have had a talk with me about going to Europe. I knew Miller did go to Europe to introduce the patents, but I don't remember that he was going to take out any patents. I am not sure about that. I don't know whether he did or not. I never spoke to Miller but once afterwards, after he came back from Europe. Q. I am speaking about before he went to

Europe. You and Miller and Uehling had talked together about his going to Europe, and about the introducing of the invention over there in Europe, had you? A. I may have.. I wouldn't deny that, but I can't remember. We were friendly enough while the thing was being put through, and no doubt exchanged ideas. * * * Q. When you knew that Mr. Miller was going to .Europe, you knew that he was going there for the purpose of introducing this casting machine into the European market? A. That is what I understood; yes."

It will also be noted that at the time of Miller's visit to Europe, early in 1898, the improvements on Uehling's device had been perfected and put into practical, successful, commercial use. The improvements then having proved successful, the three men having pending a joint application for an American patent, and Miller going abroad to exploit the invention, it is clear to us that sufficient facts and circumstances existed from which it could be fairly inferred that Miller's act in securing patent protection in England for the device came within the scope of their joint enterprise, and the patenting thereof by him was an act caused to be done by Uehling and Scott, and therefore such a prior patenting as the statute contemplated. In view of the lapse of years, of the fact that Miller is dead, that Uehling was not called to deny or disavow Miller's act, and of Scott really going no further than saying he had, after these years, no recollection of having specifically authorized the patenting, we are warranted in regarding the patenting by Miller as one authorized by Scott. And such, indeed, would seem to have been the attitude of Scott himself until this present controversy arose, for in an ex parte patent controversy to which we will hereafter allude, in which there was no one but Scott's counsel to suggest the status, it was assumed the English patent was taken out by Miller in behalf of himself, Scott, and Uehling. Thus, in a Patent Office opinion delivered in that case in 1900, it was said:

"The question here presented is one of law, arising from the fact that this sole applicant Scott jointly with one Uehling caused the invention of the appealed claims to be patented in Great Britain more than seven months prior to the date of his application in this country. The British patent thus jointly obtained is numbered 3,880 and the application therefor was dated February 16, 1898. The patent was sealed August 2, 1898. The pending application was not filed until October 27, 1900."

In view of all the foregoing facts and circumstances, we are of opinion the court below was justified in finding and holding that Scott caused the device of the patent in suit to be patented in England in 1898. Such being the case, and he not having applied for the American patent here in suit until 1900, the case falls within the literalism of the statute, from which there is no escape, unless by a construction which modifies its clear language. This construction the complainant urges by reason of the fact that, some three years after Scott joined in the joint application with Uehling and Miller above referred to, Scott in 1900 applied for the patent here in suit, alleging he was the sole inventor. It is now contended by the complainant Scott's sole patent application should have the benefit of the prior joint application, and hence the seven months limit should not apply. The Patent Office, in granting the present patent, yielded to that contention, holding:

"In order to make the foreign patent a bar against this application, it is necessary to hold that the causing of an invention to be patented in a foreign country by two joint applicants is a causing of that patent by one of the two joint applicants. That being held, and there having been filed in this country an application prior to the foreign patent by the same two persons, it ought to be held that either of these applicants, as respects a sole invention by him of what is disclosed in that prior domestic application, and for the purpose of deliverance from the bar of the statute, caused the prior domestic application to be filed in this country. The same ruling against him which brought him within the bar of the foreign patent should be made in favor of him to put him without that bar. That being so, this applicant is entitled, for this purpose, to the date of filing of the joint application as the date of filing an application in this country for the invention of the later foreign patent, and, the date of the joint application being prior to the date of the foreign patent, that patent is not a bar to the allowance of this application."

We cannot accede to this reasoning. Congress, in passing this statute, was dealing with the broad subject of the relative terms of foreign and domestic patents, and its purpose was to so synchronize the patent system of this and foreign countries that American patents should not monopolize in this country a device which had been freed from patent monopoly abroad. The statute was dealing with inventions and their monopoly, and not with the details of the forms by which individual applicants could secure their individual rights. In this case the device of the patent in suit secured patent monopoly in England in 1898. That patent expired in the year 1912, and after that date the invention was open to public use in Great Britain. More than seven months later Scott applied for the patent in suit, and it was granted in 1905. It will thus be seen that, under the ruling of the department, the whole purpose of the statute is defeated, for in this country the public is subjected to patent monopoly for years after the English public is free to use the invention. And on reflection it will appear that the fact that Scott had joined in an earlier joint application for a patent for the device should not alter the case. Had that application been pursued and granted, that patent would have duly protected the device. But *this joint application* was abandoned by Scott, and his subsequent sole application for a patent was not a division under the original application, but was a hostile and independent application, standing on its own ground. So far as time is concerned, the sole application had to stand on its own independent status, and its sole and only date of application was 1899. Such being the case, it was confronted by the fact that two years before the device in question had been caused by the applicant to be patented in England. Under such facts, we are clear the Patent Office was forbidden by the statute in question from issuing the patent in suit. The court below committed no error in dismissing the bill so far as Mr. Scott was concerned.

[3] It remains to consider the patent to McKennan and Helander. Without entering into the details of this device, we may say that its substantial feature, so far as pig-casting device went, lay in dividing the load, so that, instead of being supported eccentrically on one end of an axle, it rested on both ends. This, of course, reduced friction and wear, and was a more economical and efficient device than the eccentric carrying theretofore in use. But, conceding this, we do not

602 237 FEDERAL REPORTER

see that the adoption of a well-understood method of supporting a load at two ends of an axle, where it was theretofore carried eccentrically, involved anything more than the engineering skill, effort, and progress incident to progressive efficiency in a great art, such as blast furnace practice. Without further enlarging on the matter, we limit ourselves to stating our conclusion that we find no error in the court's conclusion that the claims in question in the McKennan and Helander patent did not involve invention.

The decree below is therefore affirmed.