## GENERAL ELECTRIC CO. v. DE FOREST RADIO CO. et al.

(District Court, D. Delaware. January 15, 1927.)

No. 561.

1. Patents ⟨⟩37—Patentably novel product may be produced by old process.

A patentably novel product may be produced by an old process.

2. Patents ⟨⟩175—Product may be claimed as produced or claimed broadly, irrespective of method of production.

Product of a process may be claimed as produced by particular process or claimed broadly, irrespective of method of its production.

3. Patents ⟨⟩165(1)—Patentee in suit on patent is bound by clear and distinct terms of claim.

When the terms of a claim in a patent are clear and distinct, the patentee in a suit brought upon it is bound by them.

4. Patents ⟨⟩167(1¼)—Claims of patent are to be construed in light of specification for purpose of limiting them to invention.

Claims of patent are to be read and construed in the light of specification, not for purpose of expanding claims, but for purpose of limiting them to invention described.

5. Patents ⟨⟩157(2)—Claims may be restricted to save patent.

Courts are disposed to restrict claims so as to save patent from objection that claims are too broad.

6. Patents ⟨⟩51(2)—Earlier article, in order to negative novelty, must be so far perfected as to be reduced to practical use (Rev. St. § 4886).

To negative novelty of patent by earlier article within Rev. St. § 4886, such article must be so far perfected as to be reduced to practical use or operation.

7. Patents ⟨⟩51(2)—Actual construction or use of article to negative novelty is unnecessary, if discovery so manifested that it could be reproduced.

Actual construction, embodiment or use of article to negative novelty is not necessary, if

its discovery has been so manifested publicly that one skilled in the particular art would be able to reproduce it.

**8. Patents ⬤⟹51(2)—Filing of allowable application for patent is sufficient reduction to practice on question of prior use.**

Filing of an allowable application for a patent constitutes sufficient reduction to practice on question of prior use.

**9. Patents ⬤⟹51(3)—Prior suggestion will not anticipate patent granted to one practically applying it.**

A mere prior suggestion will not anticipate a patent granted to one who first practically applies it.

**10. Patents ⬤⟹69—Prior published description is insufficient for anticipation, if further experiment is necessary.**

A prior published description is insufficient to constitute an anticipation, if further experiment is necessary to make, construct, or practice invention.

**11. Patents ⬤⟹51(3)—Suggestions requiring further invention do not constitute anticipation.**

Mere suggestions, which require further invention to reduce to practical use and operation, are insufficient to constitute anticipation.

**12. Patents ⬤⟹66(1)—Prior patent, to constitute "anticipation," must be sufficiently full to enable construction or practice without further invention.**

Prior patent, to constitute "anticipation," must be sufficiently full, clear, and exact to enable persons skilled in art to construct or practice the invention without exercise of further inventive skill or experiment, and description must be sufficient to constitute a specification.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Anticipation.]

**13. Patents ⬤⟹42—If product of process is itself patentably new, it may be patented irrespective of method of production.**

If a product of process or machine is itself patentably new, it may be patented as a manufacture or composition of matter, irrespective of method of production.

**14. Patents ⬤⟹42—Product cannot be patented as article made by new process or machine unless patentably new in itself.**

A product is not patentably new merely because made by a new process or machine, and it cannot be patented as an article made by such process or machine, unless it is patentably new in itself.

**15. Patents ⬤⟹37—"Patentable novelty" is production of new device by invention.**

"Patentable novelty" consists of the production of a new device by the exercise of invention.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Patentable Novelty.]

**16. Patents ⬤⟹328—No. 1,082,933, product claims 24, 26, 27, 28, 33, and 34 for improved tungsten, held invalid.**

Coolidge patent No. 1,082,933, for improvements in tungsten and methods of making the same for use as filaments of incandescent electric lamps, and for other purposes, product claims 24, 26, 27, 28, 33, and 34, held invalid.

**17. Patents ⬤⟹328—No. 1,082,933, process claims from 1 to 23, 8, 13, and 15 excepted, for methods of making improved tungsten for filaments held invalid.**

Coolidge patent No. 1,082,933, for improvements in tungsten and methods of making the same for use as filaments of incandescent electric lamps and for other purposes, process claims Nos. 1 to 23, inclusive, 8, 13, and 15 excepted, held invalid for want of invention.

In Equity. Suit by the General Electric Company against the De Forest Radio Company and another. Bill dismissed.

Charles Neave (of Fish, Richardson & Neave) and Hubert Howson, both of New York City, Albert G. Davis, of Schenectady, N. Y., and William G. Mahaffy, of Wilmington, Del., for plaintiff.

Samuel E. Darby, Jr. (of Darby & Darby), of New York City, Thomas G. Haight, of Jersey City, N. J., and Ward, Gray & Ward, of Wilmington, Del., for defendants.

MORRIS, District Judge. On December 30, 1913, United States letters patent No. 1,082,933, for improvements in tungsten and methods of making the same for use as filaments of incandescent electric lamps and for other purposes, was granted to General Electric Company as assignee of William D. Coolidge. In the suit at bar, instituted by General Electric Company against De Forest Radio Company and Robelen Piano Company, the plaintiff charges De Forest Company with contributory infringement of process claims Nos. 1 to 23, inclusive, 8, 13, and 15 excepted, and both defendants with infringement of product claims 24, 26, 27, 28, 33, and 34 of that patent. The alleged infringing acts are the manufacture and sale by the De Forest Company of radio tubes having ductile tungsten filaments made to its order by Mallory Company, an alleged infringing manufacturer of drawn tungsten wire, and the resale of those tubes by Robelen Piano Company, a De Forest distributor. The broad defenses are invalidity and noninfringement.

In General Electric Co. against Independent Lamp & Wire Co., Incorporated (D. C.) 267 F. 824, wherein the particular device alleged to be an infringement was an incandescent electric lamp having a filament formed of ductile tungsten, specifically claimed by the product claims not here in issue, all of

the 34 claims of the patent were held by me, sitting under special assignment in the district of New Jersey, valid and infringed. But, because of new specific defenses, new evidence here interposed, and an intervening decision of the House of Lords upon the corresponding British Coolidge tungsten patent, the issue of validity must here be considered anew.

Tungsten is one of the elements. In nature it is found only in combination with other elements. It is isolated in the form of a steel gray to black powder, having a fusing point of about 3200° C. Throughout the century preceding the granting of the patent in issue, chemists and metallurgists asserted that tungsten hot or cold is nonductile. In his specification, the patentee states that up to the time of the invention all efforts to work the metal had failed, and that no one had succeeded in modifying its characteristic hard, brittle structure, but that, by preparing from the powder a coherent ingot and by hot-working the ingot in accordance with the steps of the patent, he had produced from that metal a wire, miles in length, tough, fibrous, elastic, and of high tensile strength, and, at an intermediate stage of his process, "wrought" tungsten having desirable properties. not found in any tungsten of the prior art.

The product claims in suit are:

"24. A wire formed of ductile tungsten."

"26. Substantially pure tungsten having ductility and high tensile strength.

"27. A ductile tungsten wire having a fibrous structure.

"28. A form of tungsten metal pliable at room temperature."

"33. The material wrought tungsten, having a specific gravity of approximately 19 or greater, and capable of being forged and worked.

"34. Wrought tungsten, a solid coherent material characterized by the presence of crystals deformed by mechanical working."

Representative process claims are:

"2. The process which consists in agglomerating tungsten powder, sintering the body thus formed, subjecting it to repeated hot working, and continuing such hot working until the body remains ductile when cold."

"5. The process which consists in mechanically working while hot tungsten which is brittle at room temperature until it becomes pliable at room temperature."

"16. The process which consists in producing tungsten containing beneficial additions, forming it into a billet, sintering it at high temperature, and mechanically working

it a great number of times at high temperature, and reducing the temperature during the working."

"21. The method which consists in mechanically working at a temperature above approximately 1500 degrees C. a tungsten body which is brittle cold, interrupting the operation before the body is brought into the form ultimately desired, and completing the mechanical working at a temperature below 1500 degrees C."

One of the basic defenses upon which invalidity of the product claims is strenuously urged is that of want of patentable subject-matter. In support of this defense the defendants assert that those claims call for a product of nature; that the raw material to which the process is applied and the product resulting from that process are, alike, the element tungsten, and that the properties of the product, like those of the starting body are discovered, natural properties, not invented, artificial properties, as was held in the Independent Case. Two subordinate contentions by which the defendants seek to sustain this proposition are, as I understand them, that, before the earliest date claimed for Coolidge, Just & Hanaman, having disclosed by their French patent No. 358,272, issued February 7, 1906 (see [C. C. A.] 233 F. 96, 99, 100) how to make a coherent tungsten . ingot, the ascertainment that such ingot could be "wrought" and the temperature at which it could be wrought was but the discovery of a natural and inherent property of such mass of tungsten at the particular temperature, and the subsequent ascertainment that under certain other conditions—after repeated working, for instance—the mass would be malleable, pliable, and ductile cold, was but the discovery of another natural property of the element tungsten.

Next, it is asserted that the single grain or crystal of tungsten is, concededly, inherently malleable, pliable, and ductile, even at room temperature, and that at that temperature the brittleness of the mass is due to the great extent to which, at that temperature, the force of the resistance of the grain to deformation exceeds the power of adhesion or strength of union between the grains or crystals of which the mass is composed, and that the ascertainment of the temperature at which the force of resistance of the crystals to deformation is reduced below the power of adhesion is again but a discovery of a natural property and not an invention, and the ascertainment that, after continued working, the mass becomes ductile cold, was but a second discovery of something in nature.

A third contention is that the product claims are wanting in patentable subject-matter in the sense that they lack invention because of the disclosures of the prior art and because the claimed product does not spring from a creative, inventive act of the patentee, distinct from that required to invent the process by which the product is made. The plaintiff does not deny that the wire or rod of the prior Just & Hanaman patent was a coherent mass of tungsten and as such · the starting body called for by the patent in suit. It asserts, however, that, until Coolidge did his work and accomplished his results, it was not known that the Just & Hanaman rod constituted a suitable starting body. But this attempted avoidance of that which otherwise would be the effect of the admission of the sufficiency of the Just & Hanaman rods is without pertinency to the patentability of the claimed product, whatsoever be its relevancy to the claimed process, for the admission, when read in the light of the patent specification, page 3, line 72, which states that the starting body is subjected immediately to mechanical working, inevitably means that a mass of coherent tungsten possesses naturally and inherently, at some temperature, the property of workability; that is, of deformability of its grains by a mechanical force less than is required to overcome the force of their adhesion. And the fact offered in avoidance shows merely an absence of previous discovery of that natural property and not at all that the property is an artificial one.

That the characteristics or properties of an element which become patent or exist at one temperature are as natural to that element as are its characteristics existing at any other temperature is, I think, self-evident. But the product claims in issue are not for tungsten possessing the property of mere workability in some degree at some temperature. They are more specific and more drastic in their demands. With the exception of claim 34, which seems satisfiable by tungsten that *has been* worked to some extent, however slight, at some temperature, they call for tungsten that is pliable or ductile at room temperature. Tungsten becomes pliable and ductile at room temperature when sufficiently worked hot. With respect to the product claims in issue, other than 34, one problem, then, is whether ductility is a natural or an artificial property of tungsten, whether tungsten ductile cold is a "manufacture" or a product of nature, whether a single element of nature, not patentable before mechanical treatment, may be made patentable by subjecting it to mechanical treatment.

The character of a thing is, of course, like the character of a person, the sum of qualities by which that thing is distinguished from others. The view of the defendants is that the character of a single element of nature is to be ascertained by finding its reaction to every conceivable condition, by discovering the traits exhibited by it under every test to which it may be subjected, and that the characteristics thus revealed fall into no groups or classifications of natural and artificial, but are all as natural and inherent qualities, as are those exhibited under different degrees of temperature. They find no distinction in principle between subjecting tungsten to various temperatures to discover its properties and subjecting it to mechanical strain for a like purpose. They interpret the judgments rendered by the House of Lords in 1925 upon the British Coolidge tungsten patent of 1909, corresponding to that in suit, British Thomson-Houston Company, Ld., v. Charlesworth, Peebles & Co., Same v. British Insulated and Helsby Cables, Ld., 42 R. P. C. 180, wherein the two claims of that patent —(1) "a body of mechanically worked tungsten which is ductile at ordinary temperature," and (2) "the method which consists in the repeated working of a body of coherent tungsten while it is hot until it becomes ductile at ordinary temperature"—were held invalid, as a confirmation of their view. They rely particularly upon the opinion of Lord Shaw, who said "the discovery that tungsten becomes ductile cold when sufficiently worked is merely a discovery of something in nature. * * *" The plaintiff, on the other hand, finds in those judgments a denial of patentability of ductile tungsten solely upon the ground that it was produced by a process not having patentable novelty. It accounts for the want of such novelty by the disclosure of the British Coolidge tungsten patent of 1906, the first claim of which—"the method of working tungsten, which consists in subjecting the metal in a coherent form to the action of heat while it is operated on or manipulated"—and, consequently, the patent has been held "too wide" and hence invalid. British Thomson-Houston Company v. Duram (1918), 35 R. P. C. 161. In short, plaintiff's position, as I understand it, is that the claim of the 1909 patent for wrought tungsten *ductile* cold was held invalid because that product was not the result of a process patentably different from that which yielded wrought tungsten *brittle* cold; that is, that wrought tungsten ductile cold lacked invention over wrought tungsten brittle cold.

Do the judgments sustain the view of the

defendants or that of the plaintiff? The Lord Chancellor, Viscount Haldane, said: "* * * The main question in these appeals is whether the earlier patent of 1906 had so covered the field as to anticipate the invention described in the specification of the second patent, that of 1909. * * *" He points out that in the specification what is called the "crystalline" condition of the natural tungsten metal is said to disappear, and the metal to assume a ductile condition, so that a rod, when broken in two, shows long fibres running lengthwise, and adds: "Now this is, in my opinion, no more than a description of the property of ductility, which is claimed as the outcome of the methods of both patents. * * * Reading the specifications of the patents together, I think that the claim was one really for tungsten ductile cold, and not for new steps by which the metal was hammered, rolled, or drawn in a graduated fashion. * * * In the light of this and the rest of the evidence, I am unable to believe that repeated mechanical working was, by itself, a new discovery or a patentable invention under the patent of 1909. Unless the ductile cold metal, which was its product when the metal had been left to cool, added the required element of novelty in the invention, the process for its production was not patentable; and I have already given my reasons for the conclusion that tungsten ductile cold, merely as such, was not a patentable result."

Lord Dunedin held "that the specification of 1906 anticipated and invalidated the patent of 1909." The crux of Lord Buckmaster's views, as I understand them, is found in the statement, "no protection can be claimed for discovering the fact that a process of working already known produces unsuspected atomic changes in a metal, and in this case, it is on the process, and not the product, that attention must be fixed." Lord Blanesburg found the deciding factor to be that the specification of 1906 disclosed to competent persons a process for the manufacture of a tungsten filament fit for use in an incandescent electric lamp, and that there was no room for invention in the patent of 1909. The remaining opinion, that of Lord Shaw, must be examined more at length, for he deals more fully with some of the problems here involved. After finding that the 1906 specification set forth a workable method of operation, he said:

"The practical effect of all this is that every part of the case for the 1909 patent not having had a real predecessor in 1906 appears to go, unless indeed it be the case that the 1909 patent discloses some new inventive method under which either a new thing was constructed or a new property was created. What is the essence of that alleged novelty in invention, either in thing or process? It is the discovering of the cold ductility of tungsten. From the first hours of the discussion in this case, I put to myself, and occasionally to counsel, the question: Assume that cold ductility appears, or is arrived at, after certain stages of repeated mechanical working in heat, is that resultant cold ductility acquired by some special, new, and ingenious method or process, or is it a mere discovery of results which arose or could have arisen from repeated working under the old method or process; secondly, is the cold ductility so discovered a condition in which the patent shows that new ingenuity can be exercised for advantageous and good ends upon the metal at that stage? Put more shortly, the question might be: Is cold ductility reached by reason of invention or turned to new good uses by reason of invention? I got no satisfactory answer to either of the questions. But in my opinion they are vital. Because, unless the cold ductility arrived at has been so reached or is so utilized, then all that has happened is that the cold ductility remains purely in the region of discovery, and the discovery remains purely in the region of a property or quality. Nothing by way of special contrivance was required to produce this cold ductility. It simply so happens that the temperature has been or can be lowered after sufficient working in the hot metal. Is this a necessary condition of anything, or is even the reaching of this condition of any advantage, whether produced by invention or not? Both of those questions must be answered in the negative, and I accordingly conclude that the specification of 1909, whose sole merit, as alleged, is that cold ductility has been discovered, fails for lack of subject-matter. * * *

"But, while it was not established, either, in evidence or by argument, that specific temperature and steps appeared as the essentials of the invention, it was maintained, first, that the thing, namely, tungsten ductile cold, was a patentable thing, and, secondly, that the property, namely, the cold ductility of tungsten, was also patentable. I disagree with both of those propositions. The first is supported, or alleged to be supported, by the authority of Lord Davey in the Acetylene Illuminating Company v. United Alkali Company (1905) 22 R. P. C. 145, at page 153. Certain sentences are culled from his opinion, which are as follows: 'I need scarcely say

that, if the patentee had discovered a new material of the character which he mentions, a material having the very valuable commercial properties which he ascribes to it, that would have been a good subject-matter for a patent, and there would have been no question, supposing that he had done so, that his patent was a good one. He would be bound, of course, to state the means by which he produced that material, but the novelty of the means or the process by which the material was produced would have been immaterial, because the merit and the novelty of the invention would consist in the substance produced itself.' I observe that Sargant, L. J. [who sat in the English Court of Appeal in the Tungsten Case] expressed very considerable doubt as to whether the meaning of this passage can be correctly construed without a full survey of the context and contents of Lord Davey's opinion. I share that doubt. On the other hand, I am bound to confess that the counsel for the British Thomson-Houston Company were justified in citing these sentences as favoring the view that, if a new material had been discovered by no new means and by no new process of production, that material itself would have been a patentable article. If that be the meaning of the passage, I venture respectfully to say that I think such a statement of the law to be unsound. A thing discovered in ordinary trade or adventure, with no novelty or invention of means employed, is not patentable any more than would the discovery by a sailor of an island cast up by the sea. And, as to the property, I hold the present case to be conclusively settled against the alleged claims of the inventor, for the simple reason that, apart from specifications and steps which were illustrative and in no sense essential as such, there are no means set forth at all for the discovery of the property of cold ductility. It so happens that, after repeated mechanical working, it has been found that tungsten grows ductile cold. It is admitted that, after repeated mechanical working under the 1906 patent, the very same thing would have happened. So that merit and novelty disappear together.

"I think it right, my lords, to add the following sentences as to the claims in this case. I adhere in its entirety to the opinion I delivered in the 1906 case, and I further think that the reasons arrived at by the majority of the House, if applied to the facts of the present case, would show that claim 1 and claim 2 in the 1909 patent fail. I think both claims are bad. Claim 1 is for 'a body of mechanically worked tungsten which is duc-

tile at ordinary temperature'—that is, for a thing—and falls under the opinion which I have already delivered thereupon. Claim 2 is for 'the method which consists in the repeated working of a body of coherent tungsten while it is hot until it becomes ductile at ordinary temperature'—that is, for a method which discovers (in the active sense) a property of the material worked upon. The method is by repeated working of coherent tungsten—a claim already held in 1906 to be too wide. The discovery that tungsten becomes ductile cold when sufficiently worked is merely a discovery of something in nature for which discovery no contribution of inventive ingenuity was made."

Sargant, L. J., who sat in the court below, and to whose views reference was made with approval by several of the Law Lords, concluded his opinion with these words:

"Lastly, I feel grave doubt whether claim 1 of the 1909 specification is not so broad and general as to invalidate the patent, just as in the previous proceedings against Duram was held to be the case with claim 1 of the specification of 1906. For the claim is to 'a body of mechanically worked tungsten which is ductile at ordinary temperature,' and cannot, I think, be limited by claim 2, and is therefore a claim to mechanically worked tungsten ductile cold, wholly irrespective of the method by which the ductility is produced, and such as to include, for instance, an ingot of melted tungsten, whose ductility was inherent, and not due to the mechanical working which was used to reduce it to filament dimensions. To this, the respondents answered that they were claiming a new product, namely, mechanically worked tungsten which was ductile cold, and that, having found that new product and shown one way of making it, they were entitled to a patent monopoly in respect of that product, by whatever process it might be made. And they cited, in support of this contention, the remarks of Lord Davey in Acetylene Company v. United Alkali Company (1905) 22 R. P. C. 145, at page 153. Those remarks do not, in my judgment, fully justify the proposition for which they were cited; and I think that (even if tungsten ductile cold is really a new product) there is considerable force in the criticisms of this view of the law which are made in Terrell on Patents (6th Ed.) pp. 36–38. But, in view of the fact that the respondents fail on other grounds which have been more thoroughly argued before us, I prefer to leave this last question open for future determination in some case when such a determination is necessary."

Possibly some aid to a proper finding as to the basic principles of the decision is furnished by Terrell on Patents (6th Ed.) p. 35, referred to by Sargant, L. J., which says:

"Doubts have been expressed as to whether a patent can be granted for a new product, irrespective of the manner in which it has been brought into existence. It is submitted that such a grant would be wholly invalid, since it would not be for a manufacture at all. * * * The same remarks apply to a chemical product. Of course the use of the product in manufactures could be patented if the patentee described some peculiar method of using it. In other words, a discovery of properties is not a manufacture."

[1] The syllabus of the case states that the House of Lords held "that the patent of 1909 was invalid, on the ground that it was anticipated by the specification of 1906, and (by Lord Shaw) that the specification of 1909, whose sole merit, as alleged, was that cold ductility had been discovered, failed for want of subject-matter." Notwithstanding these aids, I find some difficulty in isolating the cardinal principles upon which the judgments hinged. The views expressed by Lord Davey in Acetylene Illuminating Company v. United Alkali Company (quoted by Lord Shaw) accurately state the law as it exists in the United States as I understand it—assuming, of course, that "discovered" was used by him in the sense of "invented." It is equally clear under our law that a patentably novel product may be produced by an old process. Rubber Co. v. Goodyear, 9 Wall. 788, 19 L. Ed. 566. If the decision of the House of Lords is to be understood as enunciating a broad rule that, under the law of England, all products resulting from a process that is lacking in invention are to be deemed not manufactures or inventions, but discoveries and products of nature, the test by which the one is to be separated from the other would appear to be an uncommon one. I am inclined, rather, to the view that the judgments with respect to the product claim are but a judicial affirmance of the statement in Terrell on Patents that "a discovery of properties is not a manufacture." In any event, there are many phrases which indicate a finding that the cold ductility of tungsten is to be deemed in law, if not also in fact, a discovered natural property and not a manufactured one. Be that as it may, that thought, as now presented, is one to which I can find no answer. Were workableness at some temperature of pure tungsten in a coherent mass not a natural and inherent property of that element or mass, obviously it could not be worked at all.

Hence, the initial workableness, as I see it, cannot be otherwise than a discovered property of the metal in such mass, and is not an invented or artificial characteristic. After such working, the grains or crystals are deformed, flattened, or elongated but the metal remains what it was in the beginning—the single element, tungsten. The properties of the worked mass remain to be ascertained. It is found—discovered—that, when hot, it still possesses the quality of workableness, and that, after repeated hot workings, it becomes malleable, pliable, and even ductile when cold. I think of no point or stage of the working at which the inherent properties may be said to end and manufactured or artificial properties be said to appear or be created. In fact, as I understand the record before me, the difference between tungsten workable hot and tungsten ductile cold lies only in the extent or degree to which the grains or crystals are deformed and elongated and, thus interwoven. Moreover, it seems to me that one of the inevitable corollaries of the English decision upon the 1909 patent is that the House of Lords found no marked transition stage between tungsten workable and ductile hot, brittle cold, and tungsten ductile cold. So far as the validity of the product claims is concerned, it is, of course, immaterial whether tungsten ductile cold was the result of one discovery or of a series of discoveries. The decisive factor, is that it is a discovered, inherent property, not an invented one.

A second avenue of approach, from which the defendants likewise arrive at the conclusions that ductility is a natural characteristic of tungsten, and that the product claims are consequently lacking in patentable subject-matter, is that of the single grain or crystal. In the Independent suit the testimony was (P. R. p. 211): "When small tungsten wires are heated to high temperatures in such a manner as to produce one grain of considerable length across the whole cross-section of the wire, such a grain may be kinked or bent at ordinary room temperature. As mentioned before, however, these single grains are laboratory and museum curiosities." The evidence in the present record is strikingly different. A method has been developed whereby the metal is caused to crystallize in grains of substantial and useful size. Shaller patent No. 1,256,929, Plaintiff's Exhibit No. 105. They may be several inches long. They have the properties of malleability, pliability, bendability, and ductility. Dr. Wadsworth, defendants' expert witness, drew a single crystal in the form of a filament through five dies, increasing its length from 7⅞ inches to

12 inches, and reducing its diameter from 4.5 mils. to 3.4 mils.' He was unable, however, to draw a like crystal 4.7 mils. in diameter. It is not contended by the plaintiff that the Shaller single grain filament possesses properties different from those of any other single grains or crystals of tungsten, as, for instance, those which form in the Just & Hanaman filament or those existing in a molten mass of the metal, nor is it contended that the properties of such grains are other than natural. But it is urged by the plaintiff that tungsten in the form of the Shaller filament is in a very unusual and abnormal state, and that, since the Shaller filament did not exist prior to the effective date of the patent in suit, it is immaterial whether they are ductile or not. With this I cannot agree. By the Shaller process a larger single crystal is obtained. But the properties of the crystal remain unchanged. As I see it, the main pertinency of the Shaller filament to the issues of the case at bar lies in the fact that it is a demonstration that the inherent ductility of the single grain of tungsten is a useful instead of a useless property. The Shaller filament was not here needed to show the ductility of a single crystal of tungsten, for this has been put beyond challenge by an entry made by Dr. Coolidge, under date of January 8, 1910, on page 154 of his notebook (not in evidence in the Independent Case) reading thus:

"I wanted to show them tungsten, which had been merely melted, to free it from impurities, but had not been subsequently mechanically worked (hammered, rolled, or drawn), was ductile. With this end in view, I took the globule of melted W [tungsten] which I brought home from the Auer Company and broke out a small piece. I then ground this down pretty thin on an emery wheel. I then cemented this to a flat strip of brass, and filed it still thinner. I then reduced it still further in thickness with fused KNO2. In the presence of Barlow I then placed the little flitter of metal, so obtained, on the end of my thumb and bent it cold, by pressing on it with a pencil. The bend, although pretty abrupt, shows under the microscope no sign of a crack.

"The experiment thus proves the fact that melted W is ductile, just as platinum and gold are, before it is mechanically worked at all, to produce fibers." (Bendability is shown by much evidence in the case to be one of the best tests for ductility.)

The defendants construe this entry and the testimony of Dr. Whitney, the director of the research laboratories of the plaintiff, XQ.

776, "You know to-day, do you not, that pure tungsten is ductile? A. Yes," as admissions or evidence of the ductility of tungsten generally, but it is not clear to me that Dr. Whitney's testimony should be so interpreted, and Dr. Coolidge testified that, while he believed the statements in his entry to be true when he made them, Q. 610, he does not now believe them in that form, Q. 611, and added, QQ. 612, 613: "This reference all bore on what we now speak of as single crystal tungsten. I had taken a single crystal of tungsten and in one experiment machined out a piece (that is, by grinding), and then afterwards made the piece still thinner by etching (that is, by the use of potassium nitrite), as I remember it. I had made a very thin small piece of tungsten all coming from the same crystal (that is, containing no boundary between crystals), and I had found in each of those cases that such a thin piece of tungsten coming from one crystal could be bent somewhat * * * cold; * * * it felt so soft and bent a little so easily, that I drew the conclusion, wrongly, that it would be found ductile in the ordinary sense of the word—perhaps I should not say in the ordinary sense, but ductile in every sense, just as is the case with the common metals, let us say, gold and silver (that is, that it could be cold drawn for example)." And again, Q. 617: "To get a specimen which would bend cold, you must stay all the time within crystal boundaries. * * * The specimen cut out must not cross one of these boundaries, as otherwise it will be found very brittle at the boundary." As the defendants produced no filament drawn cold, without prior hot-working, from a multi-grained mass of tungsten, there is no reasonably conclusive refutation of Dr. Coolidge's explanation of his entry. But the explanation is all sufficient to prove that the single grain of tungsten is in fact inherently ductile.

But of what avail is it to the defendants to have succeeded in establishing the natural ductility of the single crystal of tungsten? The first result is a concession of the plaintiff, made in its brief, that it is difficult to understand how an ingot consisting of inherently brittle crystals as well as inherently brittle intercrystalline cement (to the brittleness of which the plaintiff now attributes the alleged unworkability cold of the tungsten ingot) could be worked, deformed, or drawn at all. The second result is that the problem of drawing tungsten is shifted from the brittleness of the tungsten to the brittleness of the so-called intercrystalline cement, or, if previously the problem seemed to include both, it is now narrowed, mainly if not en-

tirely, to the cement. Of what the intercrystalline cement consists is not shown by the record. It has seemed difficult to think of it as a tangible substance, for a single grain of pure tungsten may be converted into two or more grains which may remain united. Consequently, I have looked upon the binding force of the grains as that of adhesion rather than as an independent tangible substance. Working tungsten in the mass, then, is merely the bringing about of the deformation of the grains by a force insufficient to overcome the force of their adhesion. Heating the metal lessens the force required to deform the inherently ductile grains. A temperature is found at which the force required to deform the grains is not sufficient to break up the multicrystal mass into its individual crystals, a temperature at which the force of adhesion between the grains is greater than the force of resistance of the grains to deformation. In this sense the inherent ductility of the grain gives, at some temperature, inherent workability and through repeated workings inherent ductility of the mass—a discovered, natural property of the mass.

[2-5] The third consequence of the establishment of the ductility of the single grain is the invalidity of the product claims in issue, 27 and 34 possibly excepted, for the further reason that they are too broad. These claims are wide enough to cover, not only the multicrystal tungsten, in which ductility becomes manifest after repeated hot working, but also the single grain which, because of its inherent ductility may be given, by the usual metal working processes, the form and shape called for by the claims. Even if the multigrain mass, when given the form called for by the claims, were patentable, the claimed product when made from a single grain is not, and, as the claims mentioned are broad enough to include the latter, they are too broad and consequently invalid. To forestall the finding that the claims are too broad, the plaintiff urges that they should be construed as if the word "drawn" were interpolated therein. But I think such construction would amount to a judicial amendment of the claims. There are two long-established and well-known modes of claiming a product of a process. One is to claim the product only as produced by the particular process. The other is to claim the product broadly, irrespective of the method of its production. Merrill v. Yeomans, 17 Fed. Cas. 113 (No. 9472); 94 U. S. 568, 24 L. Ed. 235; Plummer v. Sargent, 120 U. S. 442, 7 S. Ct. 640, 30 L. Ed. 737. When the terms of a claim in a patent are clear and distinct (as they always should be) the patentee, in a suit brought upon it, is bound by them. The claims must stand or fall as made. Keystone Bridge Co. v. Phœnix Iron Co., 95 U. S. 274, 278, 24 L. Ed. 344. To be sure, it is equally well settled that the claims of a patent are to be read and construed in the light of the specification, not for the purpose of expanding the claims, but for the purpose of limiting them to the invention described. And, within certain limits, courts are disposed so to restrict the claims to save the patent from an objection that the claims are too broad. Coupe v. Royer, 155 U. S. 565, 15 S. Ct. 199, 39 L. Ed. 263; McClain v. Ortmayer, 141 U. S. 419, 12 S. Ct. 76, 35 L. Ed. 800; Rubber Co. v. Goodyear, 9 Wall. 788, 795, 19 L. Ed. 566. But, if one invent a process by which a novel product is created, and then seek by unlimited product claims to monopolize that product howsoever created, even by nature, he is not in a position, if the validity of the claims be challenged, successfully to urge the court to construe the claims as if they had been limited by the patentee to cover only the product of the particular process. See McCarty v. Lehigh Valley Railroad Co., 160 U. S. 110, 116, 16 S. Ct. 240, 40 L. Ed. 358; Maurer v. Dickerson, 113 F. 870, 874 (C. C. A. 3); Hide-ite Leather Co. v. Fibre Products Co. (C. C. A.) 226 F. 34.

Are the product claims also wanting in patentable subject-matter in the sense that they lack invention because of the disclosures of prior patents and publications, or because there was for the product no inventive act distinct from that of the process by which the product was made? The prior disclosures upon which the defendants here rely are those which describe drawn tungsten and its utility in the electrical arts, particularly as an incandescent body for electrical lamps. British patent No. 20,175A of 1905, granted to Just & Hanaman, may be considered representative of such prior disclosures. While they reveal a conception of ductile tungsten and of uses to which it might be put, they do not disclose any workable method of drawing tungsten, and no workable method of drawing it was then known. But the defendants take the position that, even if such disclosures are not sufficient to negative novelty of drawn or ductile tungsten when claimed in a subsequent patent setting out an operative method of making it (Walker on Patents, § 57), yet they are sufficient to establish want of invention therein. To support this contention, Cohn v. United States Corset Co., 93 U. S. 366, 370, 377, 23 L. Ed. 907, One-Piece Bifocal Lens Co. v. Bisight Co. (D. C.) 246 F. 450, Id.,

259 F. 275 (C. C. A. 4), certiorari denied 249 U. S. 606, 39 S. Ct. 288, 63 L. Ed. 799, and the Bilged Barrel Case (In re Decker) 36 App. D. C. 104, are cited by the defendants. In the Cohn Case the syllabus states that:

"To defeat a party suing for an infringement of letters patent, it is sufficient to plead and prove that prior to his supposed invention or discovery the thing patented to him had been patented, or adequately described in some printed publication. A sufficiently certain and clear description of the thing patented is required, not of the steps necessarily antecedent to its production."

The court, in holding that the patent in suit was "anticipated" by a description in a prior English provisional specification, said at page 370:

"It is, therefore, fatal to the validity of the plaintiff's patent if, in fact, it (the prior publication) does describe sufficiently the manufacture described and claimed in his specification. It must be admitted that, unless the earlier printed and published description does exhibit the later patented invention in such a full and intelligible manner as to enable persons skilled in the art to which the invention is related to comprehend it without assistance from the patent, or to make it, or repeat the process claimed, it is insufficient to invalidate the patent. * * * Page 372. The specification nowhere sets forth the manner in which the alleged improvements in the corsets are produced, unless it be by reference to a jacquard in the loom. No process is described. None is patented. The claim is for a manufacture, not for a mode of producing it. * * * Page 377. It is quite immaterial, even if it be a fact, that the Johnson specification is insufficient to teach a manufacturer how to make the patented corset. It is enough if it sufficiently describes the corset itself. Neither it nor the plaintiff's specification exhibits the process of making. Neither of them set up a claim for a process. The plaintiff claims a manufacture, not a mode of making it; and the important inquiry, therefore, is, whether the prior publication described the article. To defeat a party suing for an infringement, it is sufficient to plead and prove that the thing patented to him had been patented or described in some printed publication prior to his supposed invention or discovery thereof. Rev. Stat. § 4920. What is required is a description of the thing patented, not of the steps necessarily antecedent to its production. But the evidence shows that the Johnson specification, in connection with the known state of the art at the time when it was filed and published, was sufficient to enable one skilled in the art of corset-making and in the use of the jacquard to make the patented corset."

In One-Piece Bifocal Lens Co. v. Bisight Co., Judge Rose considered the present question at length, and, after referring to the Cohn Case, held that, to constitute an anticipation of a patent for an article of manufacture by a prior patent or other printed publication, it is sufficient if the prior published disclosure clearly and accurately describes the identical thing claimed in the later patent, and that it is not necessary that such publication or patent should describe the process of manufacture, even though the earlier description of the thing was published at a time when those skilled in the art did not know, either from the literature of the art or their own knowledge, or from both combined, how to produce the article. Upon appeal (259 F. 275), this phase of the case was affirmed without discussion. In the Bilged Barrel Case the court interpreted the Cohn Case and the law as did Judge Rose. The plaintiff contends, however, that the principle of the Cohn Case goes no further than to declare that an earlier patent or publication, describing an article of manufacture, but disclosing no method of making it, is sufficient to nullify a subsequent patent for that product, if the state of the art was such at the time of the publication that one skilled in the art needed no more than a description of the article to enable him to make it. Judge Townsend took that view of it in Matheson v. Campbell (C. C.) 69 F. 597, 604, and I am inclined to think that view is sustained by the language of the opinion, and that it is emphasized by the tenor of the dissent of Mr. Justice Clifford.

The two remaining cases relied upon by the defendants (One-Piece Bifocal Lens Co. v. Bisight Co. and In re Decker), the plaintiff seeks to distinguish from the case at bar upon the ground that in those cases "the prior patents stated in exactly what manner the articles should be constructed." If by its quoted statement the plaintiff means only that the structure of the articles claimed in the patents in issue in those suits was completely described in the prior patents, I think its statement correct, but if thereby it would convey the thought that the prior patents or the known state of the art disclosed a method or process of making an article of the structure described, I think it finds no support in the reports of those cases. Moreover, it seems to me, even if the product claims here in issue are not broad enough to cover the single

grain of unworked tungsten naturally ductile at room temperature, that "drawn tungsten" constitutes a full, complete, and accurate description, and meets all the requirements of the product called for by each of those claims. Drawing is the supreme test of ductility. To be drawn, a metal must possess high tensile strength. When drawn, it has a fibrous structure, for thereby its grains are elongated and reduced in cross section. To be drawn, tungsten must be a solid coherent mass, and, when drawn, it is wrought tungsten. When sufficiently drawn, it is pliable at room temperature, and is capable of being further forged and worked at that temperature. Drawn tungsten workable, pliable, and ductile cold, lacks patentability over "drawn tungsten." British Thomson-Houston Case of 1925. The present question, as I see it, is thus narrowed to whether or not the ruling of the Bifocal Lens Co. Case is sound in principle—whether the description in the prior patents and publications of the product here claimed (if the claims should be limited in their scope) is sufficient, in the absence of a known or disclosed method of making it, to destroy the product claims in suit upon the ground that they are wanting in invention.

The solution of this problem turns, of course, upon the meaning of section 4886 of the Revised Statutes which provides:

"Any person who has invented or discovered any new and useful * · * * manufacture * * * not known or used by others in this country, and not patented or described in any printed publication in this or any foreign country; before his invention or discovery thereof, * * * may * * * obtain a patent therefor."

[6-12] Upon the issue of novelty, the character of the prior knowledge, use, and published description required to come within the meaning of this statute has now been marked out with definiteness and precision. To negative novelty of a claimed product by an earlier article, that article must have been so far perfected as to be reduced to practical use or operation. Coffin v. Ogden, 18 Wall. 120, 21 L. Ed. 821; Telephone Cases, 126 U. S. 1, 8 S. Ct. 778, 31 L. Ed. 863; Webster Loom Co. v. Higgins, 105 U. S. 580, 26 L. Ed. 1177. This requirement is satisfied if the article is put in such form as to remove it from the state of mere theory. Heath v. Hildreth, 11 Fed. Cas. 1003 (No. 6,309); Perry v. Cornell, 19 Fed. Cas. 267 (No. 11,002). Actual construction, embodiment, or use of the article is not necessary if its discovery has been so manifested publicly that one skilled

in the particular art would be able to reproduce it. Farley v. National Steam-Gauge Co., 8 Fed. Cas. 1016 (No. 4,648); Heath v. Hildreth, supra; Coffin v. Ogden, Fed. Cas. No. 2,950, 7 Blatchf. 61. The filing of an allowable application for a patent constitutes a sufficient reduction to practice upon the question of priority. 22 A. & E. Enc. of Law (2d Ed.) 310. Yet a mere prior suggestion will not anticipate or defeat a patent granted to the one who first practically applies it. Diamond Match Co. v. Schenck (C. C.) 71 F. 521; National Co. v. Belcher (C. C. A.) 71 F. 876; Foote v. Silsby, 9 Fed. Cas. 373 (No. 4,916). A prior published description is insufficient to constitute an anticipation, if further experiment is necessary to make, construct, or practice the invention. Badische Anilin & Soda Fabrik v. Kalle (C. C.) 94 F. 163, 167; Western Electric Co. v. Millheim Electric Tel. Co. (C. C.) 88 F. 505. Mere suggestions which require further invention to reduce to practical use and operation are insufficient. Western Electric Co. v. Millheim Electric Tel. Co., supra. The description in the prior publication must amount to a substantial representation of the patented article in such full, clear, and exact terms as to enable any person skilled in the art or science to which it pertains to make, construct, and practice the invention to the same practical extent as he would be enabled to do if the information were derived from a prior patent. Seabury v. Am Ende, 152 U. S. 561, 14 S. Ct. 683, 38 L. Ed. 553; Eames v. Andrews, 122 U. S. 40, 7 S. Ct. 1073, 30 L. Ed. 1064; Seymour v. Osborne, 11 Wall. 516, 20 L. Ed. 33; Florsheim v. Schilling, 137 U. S. 64, 11 S. Ct. 20, 34 L. Ed. 574; Downton v. Yeager Milling Co., 108 U. S. 466, 3 S. Ct. 10, 27 L. Ed. 789; Tilghman v. Proctor, 102 U. S. 707, 26 L. Ed. 279.

A prior patent, to constitute an anticipation, must be sufficiently full, clear, and exact to enable persons skilled in the art to construct or practice, without the exercise of further inventive skill or experiment, the invention described in the subsequent patent. 22 A. & E. Enc. of Law (2d Ed.) 316. The description must be sufficient to constitute a specification for a patent. Acme Flexible Clasp Co. v. Cary Manufacturing Co. (C. C.) 96 F. 344; Badische Anilin & Soda Fabrik v. Kalle (C. C.) 94 F. 163. But the defendants take the position that the principles by which is measured the sufficiency of a prior published description to negative novelty are not pertinent to the question of the sufficiency of that description to negative invention. They point out that, if they involve inven-

tion, are novel, and have utility, both the product and process by which it is made are patentable; that in the patent law the product or manufacture is an entity separate and apart from its creating process, and that, as to all conditions required to render it a patentable invention, the product must stand or fall alone, Robinson on Patents, § 184; that an act of invention is primarily mental and that the product is but its material embodiment, Smith v. Nichols, 21 Wall. 112, 22 L. Ed. 566. They contend that the mental part of the invention of the product resides in the idea or conception of that product as a means to an end, is complete when there is a definite idea of the thing itself even without a knowledge on the part of any one of how to make that thing, and that, when fully disclosed as in a publication, the completed conception has the effect in law of denying to one thereafter making the thing so previously conceived of a patent for the thing, and restricting the latter's reward to a patent for his process. The soundness of this contention seems to me to be placed beyond dispute by an analysis of the nature and attributes of an invention. Robinson on Patents, § 77, tells us:

"Every invention contains two elements: (1) An idea conceived by the inventor; (2) an application of that idea to the production of a practical result. Neither of these elements is alone sufficient. An unapplied idea is not an invention. The application of an idea, not original with the person who applies it, is not an invention. Hence the inventive act in reality consists of two acts, one mental, the conception of an idea; the other manual, the reduction of that idea to practice."

The first or mental part of an inventive act is an idea of means as distinguished from an idea of end. Robinson on Patents, § 108. As the primal purpose of all patent statutes is "to promote the progress of science and the useful arts," the foregoing authorities, of course, do not mean that a mental operation alone, however definite and valuable may be its result, is a complete inventive act, any more than it is a complete anticipation to a newly created thing, for that which rests in thought only is not a "manufacture," in any sense in which that word has been applied in the industrial arts. It is subject to no protection which the law is able to afford. An invention, therefore, does not exist until the generated idea has been reduced to practice, the second element of the inventive act. Robinson on Patents, § 125. But the fact that the mental operation alone does not constitute an invention is not a denial of the principle that, to be a sole inventor of a product,

the patentee must have conceived it as well as have reduced it to practice. The plaintiff does not challenge the soundness of these principles, but takes the stand that, prior to the effective date of the patent in suit, there was no conception of ductile tungsten, but only a conception of the desirability of having it. To support this view, reliance is placed upon Clark Thread Co. v. Willimantic Linen Co., 140 U. S. 481, 489, 11 S. Ct. 846, 35 L. Ed. 521, and sections 80, 87, and 88 of Robinson on Patents. But, as I understand these authorities, they do not sustain plaintiff's contention. The Clark Thread Case merely says: "A conception of the mind is not an invention until represented in some physical form. * * *" That is but a statement in different words of that which is set out in section 77 of Robinson, namely, that an invention contains two elements—a mental and a physical one. The defendants do not assert that the conception of drawn tungsten constituted an invention. On the contrary, they say that, to be an inventor, one must perform, not only the physical act involved in invention, but the mental act as well; that a person, to be entitled to the character of an inventor, within the meaning of the statute, must himself have conceived the idea embodied in his improvement; that the idea must be the product of his own mind and genius and not of another (Pitts v. Hall, 2 Blatch. 229, 234, Fed. Cas. No. 11,192); and that the prior patents and publications in the present record constitute conclusive evidence that the mental part of the inventive act, if any there was, with respect to the product had been previously performed and, consequently, was not original with Coolidge. Nor do sections 80, 87, 88 of Robinson conflict with or modify his section 77. The statement in section 87 "that the idea of means alone, and not the idea of end, is the result of the inventive act, and, therefore, is the essence of the invention" is without application, when the patentability of a product is being considered, to the means of creating that product. In such instances it refers to the idea of means embodied in the product itself. This is made clear, I think, by section 188 which says:

"The essence of a manufacture resides in the idea of means which it embodies. A manufacture, being a finished product, usually impresses the observer as a complete realization of the purposes of the inventor, and suggests the idea of an end accomplished rather than that of a means by which an end may be attained. This impression is, however, incorrect."

Drawn tungsten was conceived of and rec-

ognized by others prior to the earliest possible effective date of the patent in suit as a means for better satisfying the want that existed in the incandescent lamp industry. The existence of such want and its nature are set out in General Electric Co. v. Laco-Philips Co. (C. C. A.) 233 F. 96, and in the Independent Case (D. C.) 267 F. 824. The only problem that remained after the conception of drawn tungsten and the recognition of that idea, when embodied in tangible form, as an effective means of accomplishing the desired result had to do with an entirely different matter—the means (that is, the process) for producing that article.

Though novelty of a manufacture is negatived only by prior knowledge, use, sale, or public description of that thing reduced to practice, actual or constructive, the credit of inventing that manufacture is denied to him who merely devises the process or means for embodying in tangible form its conception by another. Drawn tungsten is a product arising from the exercise of the inventive faculties, or, because of the common practice of drawing metals and of the known properties of tungsten before and after drawing, it is not. If it is not a result of the exercise of those faculties, it is not patentable in any event. If it is a product of inventive skill (which for the purpose of the immediate question has been assumed but not held), the product claims in the patent in suit would be invalid, because the prior art discloses an earlier conception of ductile tungsten as a means of satisfying the identical public want which Coolidge would have it supply. Notwithstanding a possible lesser degree (or absence) of inventive skill in the product, drawn tungsten, than in a ground bifocal lens, may tend to create a first impression of a want of analogy between the case at bar and the Bifocal Case; yet, upon an analysis, it becomes clear, I think, that, if it be assumed, as here, that drawn tungsten possesses patentable novelty the cases are parallel, for each product would then be a patentable one. The patent for each, however, would fail, because the conception of the claimed product was not that of the patentee but of another. For the reasons stated, I find myself in accord with the conclusions of Judge Rose and the Circuit Court of Appeals of the Fourth Circuit in the Bifocal Case (D. C.) 246 F. 450; Id., 259 F. 275 (C. C. A. 4).

The plaintiff takes the further position, however, that one invention will support a claim for the product and another claim for the process, and that, as the process of making tungsten ductile cold was the result of in-

ventive skill, and so possessed of patentable novelty, both the product and the process are patentable. But, even if the process is patentable, it is impossible for me to reconcile this view with the fundamental principle that the essence of a manufacture resides in the idea of means which it embodies, or with the doctrine that a product lacking patentable novelty is not patentable though made by a process having such novelty. I find no case supporting plaintiff's contention, in which the immediate question has been squarely before the court. Moreover, Robinson on Patents, § 184, disputes the soundness of the contention. He there says:

"A manufacture is an entity distinct from the substances of which it is composed, and from the instrument or art by which it is produced. It is an instrument by itself, embodying a separate and complete idea of means, and derives from this idea its own essential character. * * * As to all the conditions required to render it a patentable invention is must stand or fall alone."

[13-15] The law seems to be well settled that, if the product of a process or machine is itself patentably new, it may be patented as a manufacture or composition of matter, irrespective of the method of production, but that a product is not patentably new merely because made by a new process or machine, and it cannot be patented as an article made by such process or machine, unless it is patentably new in itself. 22 A. & E. Enc. of Law (2d Ed.) 322, 323. Patentable novelty consists in the production of a new device by the exercise of invention. 22 A. & E. Enc. of Law (2d Ed.) 306. In Rubber Company v. Goodyear, 9 Wall. 788, 19 L. Ed. 566, the court, speaking of processes and their results, said:

"Patentability may exist as to either, neither, or both, according to the fact of novelty, or the opposite."

That the court there used novelty in the sense of patentable novelty is, I think, obvious. Support for this conclusion is found in J. E. Baker Co. v. Kennedy Refractories Co., 253 F. 739 (C. C. A. 3), in which a patent for "a product chemically and commercially unlike any dolomite product theretofore known" was sustained, the court saying:

"The patent in issue being a product patent, we are not concerned with the process by which the product is produced; that forms the subject of another patent to Baker (No. 1,063,013). The first question, therefore, is: Does this product involve patentable invention?"

Even assuming that the process by which

the product was made embodies patentable novelty, I am of the opinion that such fact furnishes no evidence of the presence or absence of patentable novelty in the product.

[16] For each of the reasons stated I think the product claims in suit are invalid.

Are the process claims valid? In his specification, the patentee states (page 1, lines 83–104): "I have discovered a process by which tungsten bodies, when prepared under certain conditions, * * * can be mechanically worked as by hammering, swaging, rolling, and drawing, and have further discovered that, when this mechanical working is carried on while the metal is heated to temperatures within certain maximum and minimum limits, and is continued long enough, such bodies will be converted from their original crystalline character to a condition having all the characteristics of a ductile metal. In other words, the repeated hot working so changes the metal that it acquires tensile strength and also becomes pliable and ductile at ordinary or room temperatures, and, if the mechanical working is carried sufficiently far, and under proper conditions, the tensile strength of the metal may become equal to or greater than that of the best steel * * * (page 2, lines 24–27). My process divides itself into two stages: First, the preparation of an ingot or billet of tungsten; and, second, the working of the ingot. * * *" The preparation of a sintered ingot or rod from the powder or tungstic oxide is then described. The specification thereupon proceeds (page 3, line 72): "the next step is the mechanical working. * * *" As to the temperature, generally, it says (page 5, lines 72–80): "It is necessary, on the one hand, that the temperature be high enough to make it possible to mechanically work the body, but, on the other hand, too high a temperature is objectionable because, if the temperature is too high, a tendency appears to lose fiber already acquired and to pass to a state of brittleness from a state of ductility * * * (page 5, lines 93–102). On the other hand, an excessive amount of mechanical working tends to cause the bodies to become so fibrous and hard as to split up and break. I have found that this result may be obviated by carrying on the mechanical working during the early stages at such temperatures as enable the body to be worked and reduced in size but without causing any special change in structure."

These statements disclose, as does the evidence, that a properly prepared body of tungsten has many properties in common with other metals. Other metals may be worked; so may tungsten. Each has its own equiaxing temperature, sometimes called its annealing temperature, at and above which its grains, when deformed by mechanical forces, promptly return, upon the removal of the force, to their equiaxial state, and below which grains, deformed by the application of mechanical force, remain permanently in their deformed condition. That is also a property of a coherent tungsten ingot. When subjected to an excessive amount of mechanical working, the fibers of other metals separate, and a fracture results in the mass. Tungsten acts in the same manner. The ascertainment that a mass of coherent tungsten could be worked, the ascertainment of the temperature below which its deformed grains would take a permanent set, and that excessive working would cause strain hardening and a separation of its fibers, were but discoveries of the properties of that metal. Laying aside its equiaxing temperature—a matter for discovery—I find nothing in the method of working tungsten that differs in principle from the working of other metals save, perhaps, that the force of adhesion between its grains is not great, and that consequently it must be worked more gently and by easier stages. But this, too, is an inherent, natural property of the metal. The method of mechanical treatment, to which it is subjected under the process of the patent, is that of swaging, hammering, rolling, drawing—the well-known processes to which other metals had long been subjected. The specified working temperatures bear no peculiar or abnormal relation to its equiaxing temperature.

But, if this is true, why did tungsten remain so long unworked and so long succeed in concealing its latent properties? The answer to this inquiry seems clear. Until the early years of the present century, there appears to have been no realization of the advantages that would result from the use of tungsten filaments in incandescent lamps and for like purposes. See General Electric Co. v. Laco-Philips Co. (C. C. A.) 233 F. 96. Not until after that conception, if I read the record aright, were any experiments made upon tungsten with the view of having it serve a definite end or purpose. While chemist and metallurgist had from time to time during the preceding century sought to discover its traits, it seems that they did so only in the quest for general knowledge. They were not inspired to a continuity of effort by an appreciation of the fact that the metal was needed to supply a great public want. But, had they known that, it is doubtful if their efforts would have been more successful. Nature gave to tungsten, in its exceedingly high fus-

ing and sintering points, a barricade of great strength with which to guard and protect its secrets. Not until man had become master of a force, and possessed of the necessary implements for its employment, greater than that which nature gave to tungsten could its secrets be wrested from it. The Bunsen burner, the preceding and the contemporary heating methods, did not constitute such a force. Nor was electricity alone sufficient. Implements which could withstand the required temperatures were likewise indispensable.

Consequently, the failure to draw tungsten before the present century is a fact of but little significance, I now think, in determining the presence or absence of invention in the claimed process of drawing tungsten. That process must stand or fall on its merits. Of what does it consist? Nothing more, as I understand the record in the present case, than the application of the old metal working processes to a coherent or solid mass of tungsten. Coolidge was not the first to conceive of or even create such a mass. Just & Hanaman, by their patent No. 1,018,502, having an effective date of November 4, 1904, not only claimed, but also disclosed how to make a wire or rod of tungsten in a coherent metallic state, homogeneous throughout. To that metal the old metal working processes were applied and the old results—wrought metal and drawn metal—obtained. There were difficulties of moment to be overcome before the old processes could be successfully applied but their solution lay in the field of discovery and not, as I view it, in that of invention. That tungsten is inherently workable was one discovery; its equiaxing temperature and working temperature zone another. Nor were these temperatures and zones found to have a surprising relation to the fusing point of the metal. I see no merit in the temperature claim. But, by saying that I see no merit in this and other claims, I intend to convey only the thought that they are not within the scope of the patent laws. I do not mean to be understood as indicating that the discoveries involved in making drawn tungsten ductile cold were not of a character entitling the discoverer to the highest credit. That they have greatly served mankind is established by the efficiency of drawn tungsten and the universality of its use. But this fact is sufficient to turn the scale in favor of invention only when the other facts in the case leave the question in doubt.

Though probably advanced mainly in support of the product claims, an examination should be made of the vulnerability of the remaining process claims, the thoria claims excepted, to plaintiff's contention, sustained in the Independent Case, that the metal working processes of the prior art taught that the application of mechanical forces to a metal below its equiaxing or annealing point produced brittleness and hardness, not ductility, malleability, and pliability, and that working hot or cold had never before been known to produce these properties, at least after cooling, in a metal normally and naturally brittle. In so far as this contention bears upon the process claims, it seems to me that its force is destroyed by the finding hereinbefore made that the claimed artificial properties of the product are inherent and natural properties, for, when a hitherto unworked metal is subjected to and worked by the old metal working processes, the discovery that the newly worked metal (a single element of nature, not a new composition of matter as in the Dolomite Case for example) possesses some natural properties that differ from those of other metals cannot convert the old process into one possessing patentable novelty, nor would the process be so converted even if the product were patentably new.

[17] The second answer to plaintiff's contention is that the evidence in the present record with respect to molybdenum is in striking contrast to that in the Independent Case. That record, as I understood it, showed that molybdenum was worked by Coolidge, or under his supervision and in accordance with his directions, in immediate connection and relation to his work on tungsten. The present record discloses, on the contrary, that Dr. Colin G. Fink, not Dr. Coolidge, was the one who did the work in the laboratories of the plaintiff upon molybdenum; that Dr. Fink did that work in the summer of 1908 while Dr. Coolidge was abroad; that in doing it he followed his own ideas; that a patent application for his work was prosecuted to allowance by the plaintiff and then abandoned; that molybdenum, a sister or analogous metal to tungsten under the Mendeljeff classification of elements, is normally brittle in the same sense that tungsten is, and is affected by heat and mechanical forces in the same way. Dr. Coolidge returned to the laboratories in September, 1908. The process by which molybdenum had been drawn was made known to him. Tungsten was drawn for the first time in the laboratories of the plaintiff a few weeks later by the same process and with substantially the same results. I think both answers of the defendants to the contention of the plaintiff are sound, and that the process claims under consideration are invalid for want of invention.

The thorium or "beneficial additions"

claims alone remain. In sustaining these claims in the Independent Case, the patent was given an effective date of July 2, 1906. Dr. Coolidge has testified in this case, however, that his application of that date contained no operative method of working tungsten, and that it was nothing more than the expression of a hope. I shall not question these statements of Dr. Coolidge. It is clear that tungsten was not drawn until October 21, 1908. But the thorium claims and disclosures were not inserted until August 15, 1910. The intervening art shows not only the addition of thoria, but shows as well its addition for the purpose of preventing offsetting. British patent to Le Tall, No. 24179 of 1906, British patent to Siemens & Halske, No. 2123 of 1907, and many others. Moreover, offsetting occurs only when an alternating current is employed. Direct current only is used for heating the filaments in radio tubes. Thoria is present in radio filaments for a purpose bearing no relation to offsetting—the increase of electronic emission. Were the thoria claims valid, the defendants would not infringe them.

The defendants present other defenses and stress their sufficiency. One is that Dr. Fink and not Dr. Coolidge was the inventor, if invention there was, of both the process and the product. Another is that R. S. § 4887 (Comp. St. § 9431), as construed by American Casting Machine Co. v. Pittsburgh Coal Washer Co., 237 F. 590 (C. C. A. 3), constitutes a bar to the validity of the patent. A third is that the De Forest Company was not a contributory infringer. But, in view of the finding of invalidity of all the claims in issue upon the grounds hereinbefore stated, these additional defenses need not be considered.

The bill of complaint must be dismissed.